Nick **ROUSSELL** and Linda Roussell, Plaintiffs–Appellants,

v.

The **CITY OF OZARK**, Missouri; Donna McQuay, Mayor; and Mike Benna, Mark Spinabella, Tom Uzzell, Brad Eldridge, Rick Gardner, and Kate Smith, City of Ozark Aldermen/women, Defendants–Respondents.

No. 26427.

Missouri Court of Appeals, Southern District, Division One.

April 27, 2005.

David C. Replogle, McDonald, Hosmer, King & Royce, P.C., of Springfield, MO, for appellants.

David V. Collignon, City Attorney, City of Ozark, MO, for respondents.

JAMES K. PREWITT, Judge.

The Christian County Circuit Court entered judgment against Nick Roussell and

Linda Roussell ("Appellants") for failing to establish that Respondents, City of Ozark ("City"), the Mayor of Ozark, and the Ozark Board of Aldermen, did not use competent and substantial evidence upon the whole record in their determination of this matter.

█ This court reviews the findings and conclusions of the Board of Aldermen and not the judgment of the trial court. *State ex rel. Teefey v. Bd. of Zoning Adjustment of Kansas City*, 24 S.W.3d 681, 684 (Mo. banc 2000). Evidence is viewed in the light most favorable to the Board's decision. *N.P. Sandbothe v. City of Olivette*, 647 S.W.2d 198, 203 (Mo.App.1983).

Appellants own a 3.5 acre tract located at 5020 North 17th Street, in Ozark, Missouri. A portion of this property is located in a floodplain zone and subject to flood plain management pursuant to § 89.020, RSMo 2000. That portion is designated by the City of Ozark as "A Zone." Any construction in an A Zone floodplain is not permitted except through the issuance of a floodplain development permit.

Appellants' plans for development of their property included, as its principal use, a building, sometimes described as a warehouse, which they intended to lease, and a parking lot, designated as an accessory use. In conjunction with this development, Appellants had requested and were granted a Solid Waste Permit by the Missouri Department of Natural Resources ("DNR") on February 22, 2002. This permit granted approval for the Appellants to operate a solid-waste-processing facility on their property. According to the "Processing Facility Description" of the permit, the type of waste acceptable for this location included "medical waste and Animal and Plant Health Inspection Service waste." The permittees designated on the permit included Mr. Roussell, as the owner, and Stericycle, Inc. ("Stericycle"), as the operator.

To comply with the City's code, Appellants intended to build the warehouse at an elevation of 1279 feet, which is five feet above the 100–year–flood minimum and four feet above the minimum elevation for A Zone construction. The property is surrounded by single-family housing. According to the City's code, "[t]he storage or processing of materials, within the special flood hazard area, that are in time of flooding buoyant, flammable, explosive, or could be injurious to human, animal, or plant life is prohibited."

On April 16, 2002, the City's Planning and Zoning Commission reviewed Appellants' site plan that included the floodplain permit application. The City's floodplain manager, Alfonso Gonzales, recommended no permit be issued, citing a need for more review. The Commission made no final decision at that meeting.

Appellants submitted a floodplain permit application, dated May 16, 2002, which the Planning and Zoning Commission ruled incomplete. This was the same conclusion reached by the City's Board of Aldermen. After both parties' engineers met, Appellants resubmitted a floodplain permit application, dated June 6, 2002, signed by Linda Roussell. This permit was the subject at the September 16, 2002 Board of Aldermen meeting where members raised issue with proposed plans for the property. Mr. Roussell stated there that he would rent the warehouse to "whomever the market yielded" and thus future plans would be impossible to predict. The Board of Aldermen requested that Appellants specify "activity that would concern neighbors in the path of development" while remaining "broad enough to market the warehouse."

After this meeting, Appellants amended their June 6, 2002 application to feature a list of excluded uses. This excluded-uses list included: (a) hazardous material de-

fined by federal statute; (b) storage and processing of flammable/explosive material or material dangerous to the lives of humans, animals, or plants; (c) any other use prohibited by local, state, or federal law. At the October 7, 2002 Board of Aldermen meeting, members reviewed this resubmission and said the permit would not be approved until "it was further amended to include 'medical waste' and 'buoyant' [materials] on excluded uses list."

While this matter was pending in the trial court, Appellants' attorney deposed Gonzales in his capacity as the City's floodplain administrator. The deposition was admitted in evidence by agreement. Gonzales stated that, prior to any floodplain permit, Appellants presented him with a building permit Stericycle had received for the property. Gonzales also said the written instruction to delay approval of the floodplain permit was the first from the Board of Aldermen he'd received in his eight years with the City. Gonzales said that he had never asked what type of building was being proposed for the property or that building's purpose.

Based upon Gonzales' deposition, Appellants maintained in the circuit court that the City did not base its decision to deny the application for a floodplain permit on competent and substantial evidence, but rather on matters arbitrary, capricious, unreasonable, unlawful, and in excess of their jurisdiction. The City asserts that the municipal codes regulate floodplains for the "promotion of health, safety and general welfare and the minimize safety hazards in [these] areas." It contends that the Solid Waste Permit issued by DNR and the existence of single-family developments around the property required the City to deny the permit. The trial court agreed and judgment was entered for the City.

■ Here, as in the circuit court, Appellants argue that City erred in denying the application for floodplain permit because the decision was not based upon substantial and competent evidence and was arbitrary, capricious, illegal and void. Appellants contend that: (a) there was no evidence that Appellants would store "buoyant, flammable, explosive or injurious materials" on the site; (b) all requirements for the floodplain permit were satisfied, and the City had no evidence to support its requirement that "medical waste" be included on the excluded-uses list for the property; and (c) the city imposed conditions on Appellants that were not required of other, similarly-situated applicants for floodplain development permits.

■ Since the denial of a zoning permit is an administrative function, *State ex rel. St. Louis County v. Jones*, 498 S.W.2d 294, 298 (Mo.App.1973), the municipal entity denying the permit must base their decision on competent and substantial evidence on the record, and any decision not based on such evidence is arbitrary and capricious, and therefore, illegal and void. *Teefey*, 24 S.W.3d at 684.

The stated public policy behind the City's floodplain management is to "promote public health, safety and general welfare and to minimize health and safety hazards in these areas." To that end, the City says it can restrict or prohibit uses that are dangerous to health, safety, or property in times of flooding heights or velocity.

The City referred to the Solid Waste Permit to Appellants by DNR on February 22, 2002, that explicitly spelled out acceptable waste at this facility. This included "medical waste and Animal and Plant Health Inspection Service waste." The Solid Waste Permit also included Stericycle as a permittee. The City points out that, despite the Roussells' claim that the property's future use is undetermined, there is no evidence on the record to sug-

gest that Appellants' tie with Stericycle on the property has been severed. Thus, the City says, there was evidence suggesting that Appellants could store buoyant, flammable, explosive or injurious materials on the site.

Additionally, Appellants maintain that their compliance with the City's code, § 410.040(B)(1)(b), to build five feet over the 100–year–flood minimum excludes the structure's status as within the floodplain. This is a misreading of § 410.040(A)(2) of the City's code, which allows for non-residential structures to be built at least one foot over the floodplain, "subject to all provisions of this Chapter." § 410.040(A)(3)(a) of the City's code. Simply following the provision for building over the 100–year–flood minimum may not diminish or delete the need to protect the public from buoyant, flammable, explosive or injurious materials.[1]

Under § 410.030(D) of the City's code, an application for a Floodplain Permit *shall* include information regarding description of the work to be covered by the floodplain development permit, use or occupancy for which the proposed work is intended, other information as reasonably required by the Floodplain Administrator, and also be accompanied by plans and specifications for proposed construction. These requirements may not only help the municipal decision-maker determine requests that will affect the best interest of public health, welfare, safety and morals but also to use those factors in order to measure the impact on the general character of the neighborhood. *Sandbothe*, 647 S.W.2d at 203–04.[2]

---

1. § 410.040(B)(1)(b) of the City Code of Ozark, Missouri, states:

> In all areas of special flood hazard, once base flood elevation is obtained, as set forth in Section 410.040(a)(2), the following provisions are required:
> b. *Non-residential construction.* New construction or substantial improvement of any commercial, industrial, or other non-residential structure, including manufactured homes, shall have the lowest floor, including basement, elevated to or one* (1) foot above the base flood level, or together with the attendant utility and sanitary facilities, be floodproofed so that below the base flood level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydro-dynamic loads and effects of buoyancy. A registered professional engineer or architect shall certify that the standards of this Subsection are satisfied. Such certification shall be provided to the Floodplain Administrator as set forth in Section 410.030(C)(7)(c).
> *The FEMA, Region VII office recommends elevating to one (1) foot above the base flood elevation to qualify for flood insurance rates based upon floodproofing.

§ 410.040(A)(2) of the City Code of Ozark, Missouri, states:

> All areas identified as unnumbered A Zones on the FIRM are subject to inundation of the 100–year flood; however, the base flood elevation is not provided. Development within unnumbered A Zones is subject to all provisions of this Chapter. If Flood Insurance Study data is not available, the community shall obtain, review, and reasonably utilize any base flood elevation or floodway data currently available from Federal, State, or other sources.

§ 410.040(A)(3)(a) of the City Code of Ozark, Missouri, states:

> All new construction, subdivision proposals, substantial improvements, prefabricated buildings, placement of manufactured homes, and other developments shall require:
> a. Design or adequate anchorage to prevent flotation, collapse, or lateral movement of the structure resulting from hydrodynamic and hydrostatic loads, including the effects of buoyancy[.]

2. § 410.030(D) of the City Code of Ozark, Missouri, states:

> D. *Application For Floodplain Development Permit.* To obtain a floodplain development permit, the applicant shall first file an application in writing on a form furnished for that purpose. Every floodplain development permit shall:

■ Appellants contend that adding "medical waste" to the list of excluded uses for the property was not justified by the record, and, therefore, they had fully satisfied the requirements of the City's application process. The existence of single-family developments around the proposed property, coupled with Appellants' Solid Waste Permit, appear to have caused the request for specifics about the property's use. The municipal code allows the City to seek additional information as part of the application process.

Based on these considerations, the City's request for an excluded-uses list including medical waste is based upon the authority of the municipal code as well as the evidence in this proceeding. The City may determine to restrict or prohibit uses that are dangerous to health, safety, or property in times of flooding.

■ A municipal body, in denying zoning permits, may not "pick and choose" between similarly-situated applicants. *Ford Leasing Dev. Co. v. City of Ellisville*, 718 S.W.2d 228, 233 (Mo.App.1986). Nothing in the record suggests that the City has approved the permit of a similarly-situated applicant. Appellants point to Gonzales' assertion that "no [such] circumstance had ever been presented [to him]" during his eight-year tenure with the City as evidence. This does not prove that the City has granted an application prior to this in a similar situation. The City may not have had any similarly-situated applicants prior to Gonzales' employment or could have had similarly-situated applicants whose requests were denied prior to Gonzales' arrival.

Appellants have failed to meet their burden to demonstrate that the City's action in denying their application was not supported by competent and substantial evidence and that it was illegal, arbitrary, capricious, unreasonable, or in excess of the City's authority. We cannot say the decision of the Ozark Board of Aldermen was improper.

The judgment is affirmed.

GARRISON, P.J., concurs in result only.

RAHMEYER, J., concurs.

1. Describe the land on which the proposed work is to be done by lot, block and tract, house and street address, or similar description that will readily identify and specifically locate the proposed building or work;
2. Identify and describe the work to be covered by the floodplain development permit;
3. Indicate the use or occupancy for which the proposed work is intended;
4. Indicate the assessed value of the structure and the fair market value of the improvement;
5. Identify the existing base flood elevation and the elevation of the proposed development;
6. Give such other information as reasonably may be required by the Building Inspector;
7. Be accompanied by plans and specifications for proposed construction; and
8. Be signed by the permittee or his/her authorized agent who may be required to submit evidence to indicate such authority.